**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RUPERT EDWARD LUDLOW VISCOUNT
BLEDISLOE, MATILDA BLANCHE
CLARK, and OTTO BENJAMIN CHARLES
BATHURST,

                  Plaintiffs

      v.

ART FINANCE PARTNERS LLC and
ANDREW C. ROSE,

                Defendants.

Civil Action No. 1:20-cv-06358-AT

**AMENDED COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs Rupert Edward Ludlow Viscount Bledisloe, Matilda Blanche Clark, and Otto

Benjamin Charles Bathurst (together "Plaintiffs") bring suit against defendants Art Finance

Partners LLC ("AFP") and Andrew C. Rose ("Rose") (together "Defendants"), and hereby allege

as follows:

## NATURE OF ACTION

1. Plaintiffs are the rightful and sole owner of a certain work of art by the artist Thomas

Gainsborough, known as *The Bathurst Children* (the "Artwork").

2. The Artwork has been wrongfully converted by Defendants by means of acquisition from

the notorious art fraudster, Timothy Sammons, now imprisoned for his fraudulent acts.

3. Plaintiffs seek replevin of the Artwork, and damages for conversion and aiding and

abetting a breach of fiduciary duty.

## PARTIES

4. Plaintiffs are the three children of the late Viscount Bledisloe QC, and are all residents of

the United Kingdom.

5.   Defendant Art Finance Partners LLC ("AFP") is a Delaware limited liability company, registered to do business in New York, with a place of business at 41 E. 57th St., Suite 702, New York, New York 10022.

6.   Defendant Andrew Rose is a natural person, and, on information and belief, is the owner or holder of a controlling interest in AFP.   On information and belief, Mr. Rose maintains his place of business at 41 E. 57th St., Suite 702, New York, New York 10022, and on information and belief is a resident of the State of Delaware.

## JURISDICTION AND VENUE

7.   On information and belief, AFP is a limited liability company with two members, Andrew Rose and Christopher Krecke.

8.   On information and belief, Mr. Rose is a resident of the State of Delaware and maintains an office in New York City.

9.   On information and belief, Mr. Krecke is a resident of the State of New York, and maintains an office in New York City.

10. Plaintiffs are all residents of the United Kingdom.

11. Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332(a)(2), as there is diversity of citizenship, and the amount in controversy exceeds $75,000.00.

12. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the claim occurred in the Southern District of New York.

## STATEMENT OF FACTS

The Background of the Artwork

13. The Artwork at issue is a painting by Thomas Gainsborough, painted in approximately 1759, and commissioned by Benjamin Bathurst.

14. The Viscount Bledisloe QC was a descendent of Benjamin Bathurst, and obtained the Artwork through descent from his ancestor.

15. In 2005, the Artwork was exhibited by Sotheby's in London, and Sotheby's valued the artwork at between £400,000-600,000 (approximately $728,000-1,092,000 in United States currency at the time).

16. On May 12, 2009, the Viscount Bledisloe QC passed away, leaving behind his estate (the "Estate").

17. Plaintiffs, as heirs to the Estate, paid probate expenses on the Artwork of over £200,000.

18. In August of 2009, the executors of the Estate had the Artwork sent to Timothy Sammons Ltd ("TSL") a company organized under the laws of the United Kingdom, and on information and belief, a company solely owned at the time by Mr. Timothy Sammons, a Mayfair art dealer. The Estate sent the artwork to TSL for valuation purposes.

19. On September 24, 2009, TSL valued the Artwork at between £300,000-400,000 ($471,000-628,000 at the time). TSL sought permission at that time to sell the Artwork on behalf of the Estate.

20. On September 29, 2009, TSL and the Estate's executors entered into a consignment agreement for the sale of the Artwork ("Consignment Agreement"). Mr. Sammons executed the agreement on behalf of "Timothy Sammons Ltd" but Mr. Sammons was not a party to the Consignment Agreement.

21. On May 11, 2011, the Estate passed title to the Artwork by deed of appointment to the Plaintiffs.

The Theft of the Artwork by Timothy Sammons and TSI, and Purported Transfer to Defendants

1. On information and belief, Mr. Sammons was also, prior to the events described hereunder, the sole owner of a New York corporation named Timothy Sammons, Inc. ("TSI").

2. TSI was incorporated in New York in 2001 and dissolved by proclamation on April 27, 2011.

3. TSI was not a party to the Consignment Agreement; the agency appointment contained in the Consignment Agreement was made explicitly exclusive to TSL.

4. By January of 2014, Mr. Sammons was in significant money trouble.

5. By January 6, 2014, certain plaintiffs including Mr. Michael David Wood had obtained a judgment against TSI in the courts of the United Kingdom for over £1.3 million with regard to TSI's failure to pay for an artwork.

6. On January 31, 2014, Mr. Wood and the other plaintiffs filed a motion for summary judgment in lieu of complaint to domesticate the foreign judgment, in the matter of <u>Wood <i>et al.</i> v. Timothy Sammons, Inc.</u>, Index No. 10938/2014.

7. One day before, on January 30, 2014, Mr. Sammons had a conversation and/or meeting with Mr. Rose, the owner of AFP. On information and belief, that conversation involved Mr. Sammon's need for money, and his willingness to put up artwork as collateral for loans.

8. AFP is a sophisticated merchant involved in the purchase, collection, sale, and lending relating to artworks.

9. Mr. Rose has more than 30 years of experience in fine art and has worked at two large art auction houses.

10. On information and belief, during the January 30, 2014 meeting Mr. Sammons informed Mr. Rose that he was in financial difficulty and wished to borrow money.

11. Beginning on February 5, 2014, AFP drew up a series of lending agreements between Mr. Sammons and AFP.

12. This lending agreement, and the following ones described below, were in two parts:

    a. a letter agreement that laid out the terms of the agreement, including a payment from Mr. Sammons to AFP, and a "right to repurchase" at a higher amount, including 10% premium and interest; and

    b. a stand-alone "bill of sale" that did not reference the agreement.

13. Each of the lending agreements was between AFP and Mr. Sammons.

14. Each of the lending agreements included the name "TIMOTHY SAMMONS FINE ART" under Mr. Sammons' name.

15. Each of the "bills of sale" included the name "TIMOTHY SAMMONS FINE ART AGENTS" under Mr. Sammons' name at the top of the page.

16. On information and belief, the names "TIMOTHY SAMMONS FINE ART" and "TIMOTHY SAMMONS FINE ART AGENTS" are nonexistent entities, with no legal standing, and each agreement was executed on behalf of Mr. Sammons alone.[1]

17. The February 5, 2014 agreement involved five works of art by Duffy, Moore, Wesselman, Twachtman, and Weber (the "First Group"). Under that agreement, AFP paid $360,000 to Mr. Sammons. The agreement gave Mr. Sammons a "right to repurchase" for three months for $396,000, and thereafter at increasing amounts compounding at 1.5% interest per month.

---

[1] On July 1, 2016, AFP and certain other entities filed a lawsuit in the Supreme Court of the State of New York, New York County, entitled Art Finance Partners LLC et al. v. Timothy Sammons et al., Index No. 651190/2016, in which APF and the other plaintiffs alleged that "Timothy Sammons Fine Art Agents" was "an unincorporated entity used by Sammons which, at all relevant times, had its offices in New York City." (Complaint at ¶ 9).

18. The clear intent of the February 5, 2014 agreement was to be a loan at interest with the artwork as collateral.

19. The essence of the deal was the same as that of a pawnshop: the shop pays out money and holds the collateral, and keeps the collateral if the borrower is unable to repay.

20. On information and belief, the February 5, 2014 agreement was intentionally written so as to provide AFP with an argument that AFP was a "buyer in the ordinary course of business," rather than a lender under the New York Uniform Commercial Code ("UCC").

21. On February 10, 2014, Sammons and AFP entered into a second agreement, similar to the February 5, 2014 agreement regarding the loan of $150,000 relating to a painting by Moore.

22. On the same date, in an email, Mr. Rose described the loan agreements as "short term deals" that are "like true pawnshop deal, in about 1 out of 5 deals, we end up owning the work as the seller either does not make three month payment . . . ."  In the same email, Mr. Rose noted that "Sammons needs some quick cash."

23. This February 10, 2014 email is an admission that the agreements are loans, because in 4 out of 5 of the agreements the amount is repaid and the artwork is returned to the borrower.

24. On February 19, 2014, Sammons and AFP entered into a third agreement (the "Loan Agreement") relating to the loan of $200,000 for the Artwork at issue here.

25. TSL was not a party to the Loan Agreement.

26. As with the other agreements describe above, Mr. Sammons executed the Loan Agreement on his own behalf.

27. On information and belief, by that date Mr. Sammons had physically transported the Artwork from London to New York for the purposes of the Loan Agreement.

28. Plaintiffs and its representatives were unaware that the Artwork had been removed from London to New York, and gave no permission to Mr. Sammons to do so.

29. The Consignment Agreement did not authorize Mr. Sammons' removal of the Artwork from the possession of TSL, nor did it authorize the relocation of the Artwork outside of the United Kingdom.

30. By the date of the Loan Agreement, the January 6, 2014 lawsuit by Mr. Wood *et al.* in the United Kingdom, and the subsequent January 31, 2014 lawsuit by Mr. Wood before the Courts of the State of New York were both public record available to AFP.

31. By the date of the Loan Agreement, Sammons had in rapid succession borrowed $710,000 from AFP in three transactions over 14 days.

32. The amount loaned on the Artwork was $200,000, which was less than half of the $471,000-628,000 appraisal of value of the Artwork by TSL in 2009, and less than one-third of the $728,000-1,092,000 appraisal of the value of the Artwork by Sotheby's in 2005.

33. On information and belief, the other loans on the other artworks were also undervalued.

34. Red flags were present: Mr. Sammons' statement that he was in need of fast cash, the publicly available record of pre-existing civil lawsuits against Mr. Sammons, and most especially the fire sale pricing for the Artwork, should have warned AFP that Mr. Sammons did not have good title to the Artwork.

35. On March 26, 2014, April 2, 2014, and April 15, 2014, AFP entered into other similar agreements with Mr. Sammons for $90,000, $200,000, and $45,000, respectively, with regard to an artwork by Calder.

36. After the Calder transaction AFP had loaned Sammons at least $1,045,000.

37. On June 30, 2014, Mr. Rose wrote Mr. Sammons an email demanding $52,507.29 as an "extension payment" on the various loans, and explaining the "payment and due dates through July."

38. This email is another clear indication that the Loan Agreement was a loan, not a purchase.

39. On October 10, 2014, Mr. Rose wrote an email following up on what was owed for "the extensions on the purchases."

40. In a September 2, 2014 email Mr. Rose informed Mr. Sammons that they were "at capacity" unless there was "additional collateral," once more referring to the transactions implicitly as loans.

41. In an October 20, 2014 email Mr. Rose write to Mr. Sammons and informed him that he owed "around $50m," and to "please get us some $$ ASAP as I want to tell our lenders that everything is current." This once more is an implicit recognition that the agreements at issue were loans.

42. By November 25, 2014, Mr. Rose was continuing to deal with Mr. Sammons on multiple artworks, and Mr. Sammons continued to inform Mr. Rose of his "funding requirements."

43. Ultimately the State of New York extradited Mr. Sammons from the United Kingdom for prosecution for grand larceny and schemes to defraud.

44. The State of New York seized the Artwork from Mr. Rose and AFP for evidence in the prosecution of Mr. Sammons.

45. On January 29, 2019, counsel for Plaintiffs, having learned of the loss of the Artwork and its transport to New York, demanded the return of the Artwork.

46. AFP did not return the Artwork to Plaintiffs.

47. On August 1, 2019, the State of New York sentenced Mr. Sammons to four to twelve years in prison.

48. Mr. Sammons was convicted of six counts of grand larceny in the first degree, eight counts of grand larceny in the second degree, and one count of a scheme to defraud in the first degree.

49. As adjudged by the State of New York, Mr. Sammons is a thief.

50. By January of 2020, the State of New York sought to release the Artwork from evidence to the parties, but, being aware of a dispute as to the ownership of the Artwork, required the parties to inform the State of the agreed upon disposition of the Artwork.

51. On January 24, 2020, counsel for the parties hereto reached an agreement whereby AFP would hold the Artwork in escrow pending the resolution dispute between the parties, whether in or out of Court, until at least July 30, 2020. If Plaintiffs were to file a lawsuit by July 30, 2020, the escrow arrangement would continue during the pendency of the lawsuit.

52. On July 27, 2020, counsel for Defendants agreed to extend the deadline to file the lawsuit to at least August 13, 2020.

53. The parties have been unable to reach terms of a settlement, and therefore Plaintiffs bring suit.

54. Per the terms of the parties' escrow agreement, AFP will continue to hold the Artwork in escrow during the pendency of this lawsuit.

55. On information and belief, Mr. Rose is the sole owner of AFP.

56. On information and belief, Mr. Rose so exercises complete dominion and control over AFP that AFP is the alter ego of Mr. Rose.

57. Mr. Rose used the dominion and control over AFP to commit the wrongs against Plaintiffs described below.

## FIRST CLAIM FOR RELIEF
### (Replevin – Against All Defendants)

58. Plaintiffs repeat and reallege the allegations of Paragraphs 1-57 as if set forth in full herein.

59. Plaintiffs are the rightful and only owners of the Artwork.

60. In 2009, pursuant to the terms of the Consignment Agreement, Plaintiffs exclusively entrusted the Artwork to TSL.

61. The Artwork was never entrusted to Mr. Sammons or TSI.

62. Mr. Sammons purported to personally convey the Artwork to AFP in 2014 by means of the Loan Agreement.

63. Neither Mr. Sammons nor TSI had any title to the Artwork.

64. As adjudged by the State of New York, Mr. Sammons is a thief, who stole the Artwork, and cannot convey good title.

65. Defendants therefore have no title to the Artwork.

66. Defendants knew or should have known that neither Mr. Sammons nor TSI had any title to the Artwork.

67. Defendants are in possession of the Artwork.

68. The Artwork is a valuable and unique chattel and should be immediately returned to Plaintiffs.

69. Plaintiffs' right to possession of the Artwork is superior to any right claimed by Defendants.

70. Defendants have refused to return the Artwork after demand by Plaintiffs.

71. Defendants have unlawfully retained possession of the Artwork.

72. As a result of the foregoing, Plaintiffs are entitled to the return of the Artwork.

## SECOND CLAIM FOR RELIEF
### (Conversion – Against All Defendants)

73. Plaintiffs repeat and reallege the allegations of Paragraphs 1-72 as if set forth in full herein.

74. Plaintiffs are the rightful and only owners of the Artwork.

75. In 2009, pursuant to the terms of the Consignment Agreement, Plaintiffs exclusively entrusted the Artwork to TSL.

76. The Artwork was never entrusted to Mr. Sammons or TSI.

77. Mr. Sammons purported to personally convey the Artwork to AFP in 2014 by means of the Loan Agreement.

78. Neither Mr. Sammons nor TSI had any title to the Artwork.

79. Defendants knew or should have known that neither Mr. Sammons nor TSI had any title to the Artwork.

80. As adjudged by the State of New York, Mr. Sammons is a thief, who stole the Artwork, and cannot convey good title.

81. Defendants therefore have no title to the Artwork.

82. Plaintiffs' right to possession of the Artwork is superior to any right claimed by Defendants.

83. Defendants nonetheless (i) assumed and exercised rights of ownership over the Artwork, and (ii) attempted to commercially exploit their claimed ownership interest in the Artwork.

84. Plaintiffs have been damaged as a result of Defendants' unlawful conversion in an amount to be proven in trial, but in excess of $471,000.

### THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty – Against All Defendants)

85. Plaintiffs repeat and reallege the allegations of Paragraphs 1-84 as if set forth in full herein.

86. TSL owed a fiduciary duty to Plaintiffs by virtue of being entrusted with the Artwork.

87. TSL breached its fiduciary duty to Plaintiffs by transferring possession of the Artwork to Mr. Sammons and/or TSI, who then purported to transfer a security interest in the Artwork to AFP, and to allow Defendants to take possession of the Artwork, and ultimately by purporting to convey the Artwork to AFP as collateral.

88. Defendants knew or should have known that neither Mr. Sammons nor TSI had any title to the Artwork.

89. On information and belief, Defendants nonetheless knowingly induced Sammons to enter into the Loan Agreement, purporting to transfer a security interest in the Artwork to AFP.

90. Defendants directly participated in TSL's breach of its fiduciary duty by inducing Sammons to abscond with the Artwork and enter into the Loan Agreement.

91. Defendants' actions were knowingly deceitful and maliciously intended to cause Plaintiffs harm and to enrich themselves at Plaintiffs' expense.

92. Plaintiffs have been damaged as a result of Defendants' aiding and abetting TSL's breach of fiduciary duty in an amount to be proven in trial, but in excess of $471,000.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

a. Ordering Defendants to immediately return the Artwork to Plaintiffs;

b. Ordering Defendants to pay damages to Plaintiffs, including punitive damages;

c. Pre-judgment and post-judgment interest;

d.  Plaintiffs' costs of this action;

e.  Plaintiffs' reasonable attorneys' fees;

f.  Punitive damages; and

g.  Such other and further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a jury trial with respect to all issues triable before a jury.


Dated: August 23, 2020

BOWLES & JOHNSON PLLC
*Attorneys for Plaintiffs*

_____
David K. Bowles
14 Wall Street, 20th Floor
New York, New York 10005
T: (212) 390-8842
F: (866) 844-8305
E: David@BoJo.Law